NOT DESIGNATED FOR PUBLICATION

No. 119,485

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JEALONI E. DANIELS,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; J. DEXTER BURDETTE, judge. Opinion filed December 6, 2019. Reversed and remanded with directions.

*Jean Phillips*, supervising attorney, of Paul E. Wilson Project for Innocence and Post Conviction Remedies, of University of Kansas Law School, of Lawrence, for appellant.

*James Antwone Floyd*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., ATCHESON, J., and BURGESS, S.J.

ATCHESON, J.: At the start of a criminal case, jurors take an oath that they will render a decision based solely on the law and the evidence—what is commonly called a "true" verdict. At the end of a case, those jurors state that truth through their written verdict. But they can speak no more clearly and articulately than the verdict forms permit. In this habeas corpus attack on his convictions for attempted murder, Jealoni Daniels submits the verdict forms impermissibly restricted the jurors' option to find him not guilty, thus garbling their true intentions and impinging on his constitutional right to a

1

jury trial. The Wyandotte County District Court summarily denied Daniels any relief. On appeal, Daniels requests a new trial on those charges or, alternatively, an evidentiary hearing on his habeas corpus motion.

After examining Daniels' motion made under K.S.A. 60-1507, the district court's denial, and the record in the criminal case, we conclude Daniels has raised a viable constitutional claim as to his convictions for attempted first-degree murder and attempted second-degree murder. Given the procedural posture of this appeal, we must either affirm the district court's denial of the 60-1507 motion or reverse and remand for a hearing. We reverse and remand to the district court with directions to appoint a lawyer for Daniels and to hold an evidentiary hearing.

In the underlying criminal case, the district court fashioned a deficient verdict form so confusing that Daniels' constitutional right to a jury trial was compromised. The deficiencies in the verdict form cannot be excused as harmless error on the attempted murder charges, given Daniels' vigorous defense at trial. What we resolve today entails a legal question rooted in how to assess the efficacy of a guilty verdict when errors in the verdict form create material barriers to a jury rendering a not guilty verdict. As we explain, our determination of error does not automatically entitle Daniels to a new trial. On remand, Daniels still must show that the lawyers representing him in the underlying criminal case during the trial and on the direct appeal had no sound legal strategy for failing to challenge the verdict forms. With that direction, we have endeavored to identify the governing legal threads woven into the substance of Daniels' habeas corpus claim, appropriately tailoring what the district court and the parties should address and resolve on remand.

2

FACTS AND PROCEDURAL HISTORY

The State charged Daniels with two counts of attempted first-degree murder in the shootings of John Jones and Dennis Henderson and one count of unlawful possession of a firearm after a felony conviction. The jurors heard conflicting accounts of the events during a four-day trial in February 2012. Highly summarized, the evidence showed that Daniels, Chico Kelly, and Leon Granger were at a house in a residential neighborhood in Kansas City, Kansas, on a September evening in 2011. Daniels and Kelly knew each other and were in relationships with two sisters who lived there. Granger was a recent acquaintance of Kelly's. Kelly had an ongoing dispute with Jones, who also lived in the neighborhood.

In one version, Daniels, Kelly, and Granger all had handguns and decided to ambush Jones at his house. They found Jones in his front yard. Daniels and Kelly drew their weapons and began firing as Jones ran toward his house. Henderson, who was on the porch, was shot in the chest. Jones received a comparatively superficial gunshot wound. Both men survived. Granger testified at Daniels' trial and told jurors he thought Kelly intended to challenge Jones to a fistfight, so he went along to watch. He testified he was unarmed. According to Granger, Daniels had both a pistol and a revolver. Other witnesses said Granger had a handgun that evening.

Daniels testified in his own defense. He offered the jurors an unusually convenient and self-serving account of his conduct. Daniels said Kelly and Granger were horsing around with each other in mock gun fights—Kelly had a .45 Ruger pistol, and Granger had a .380 Bersa pistol. Daniels testified he had a .9 mm Taurus pistol he carried for self-defense. He explained to the jurors he chose not to join Kelly and Granger in what he characterized as their "childish" antics. Daniels was aware of the bad blood between Kelly and Jones. When Jones drove by and Kelly said something about getting him, Daniels testified he, too, thought he was going to see a fistfight.

3

According to Daniels, Kelly pulled out his pistol and started shooting. Granger then drew his pistol and fired. Although the bulk of the evidence indicated neither Jones nor Henderson was armed, Daniels testified that he perceived somebody to be shooting back, so he ran. He told the jurors he stopped briefly, drew his pistol, fired shots in the air, and then continued running.

Daniels assisted Kelly who had a gunshot wound for which he was treated at a local hospital. Kelly did not testify during Daniels' trial. Law enforcement officers recovered shell casings from a .45 caliber pistol and a .380 pistol in front of Jones' house.

At trial, Daniels acknowledged having a handgun and being a convicted felon, effectively confessing to the unlawful possession of a firearm charge. He conceded he initially told law enforcement officers he wasn't at Jones' house at the time of the shooting and denied any involvement in the incident. He also agreed that after he was arrested he attempted to persuade several witnesses to offer accounts of the events favorable to him.

We now pause to outline the jury instructions and in particular the verdict forms, since they are at the heart of Daniels' claim in his 60-1507 motion. The jury instructions set out the elements of attempted first-degree murder for each count in separate instructions for the shooting of Jones and for the shooting of Henderson. The district court also instructed the jurors on the lesser included offenses of attempted intentional second-degree murder of Jones and Henderson. The jurors received an instruction on the criminal liability of an aider and abettor. Another instruction outlined the elements of the unlawful possession of a firearm charge, and a related instruction informed the jurors Daniels admitted he had been convicted of a felony that precluded him from lawfully possessing firearms. The district court instructed the jurors that they should consider each charged crime separately, that Daniels could be convicted or acquitted of some or all of

4

the charges, and "[y]our finding as to each crime charged must be stated in a verdict form signed by the Presiding Juror." That instruction matched PIK Crim. 4th 68.080. The district court gave the jurors other fairly standard instructions that aren't relevant here.

The verdict forms consisted of three pages. We have reproduced exemplars of those pages at the end of our opinion in the order they appear in the district court record for the underlying criminal case against Daniels. The exemplars match the format of the originals and merely lack the name and signature of the presiding juror. The first page identifies each of the two attempted murder charges—one with Jones as the victim and one with Henderson—followed by the lesser included offenses for each charge, thereby presenting the jurors with four possible options. Each option is phrased this way: "We, the jury, find the defendant, Jealoni Daniels, guilty of the crime of [either attempted first-degree murder or attempted second-degree murder] concerning [name of victim]." A signature block for the presiding juror follows each of those statements. So the first page contains places for the jurors to indicate they have found Daniels guilty of attempted first-degree murder or attempted second-degree murder of Jones and guilty of attempted first-degree murder or attempted second-degree murder of Henderson.

The second page addresses the charge for unlawful possession of a firearm and contains one statement and signature block to find Daniels guilty and a separate statement and signature block to find Daniels not guilty.

The third (and last) page consists simply of this statement: "We, the jury, find the defendant, Jealoni Daniels, not guilty." The statement is followed by a signature block for the presiding juror.

After informally discussing the jury instructions and presumably the verdict forms with the prosecutor and Daniels' trial lawyer, the district court held a brief conference on the record. At that conference, nobody objected to the verdict forms.

5

During their deliberations, the jurors submitted a written question asking, "Can we find the defendant guilty of first degree for one charge, second degree for [the] other charge or are the charges coupled?" After discussing the question with the lawyers, the district court responded in writing this way: "Yes. The charges are not coupled. Reread Instruction No. 14." The district court mistakenly believed the answer directed the jurors to Instruction No. 15 based on PIK Crim. 4th 68.080 for considering the counts separately. But Instruction No. 14 actually outlined the State's burden of proof in establishing the elements of a charged crime and the defendant's presumption of innocence, as described in PIK Crim. 4th 51.010.

The jury convicted Daniels of the attempted first-degree murder of Jones, the attempted intentional second-degree murder of Henderson, and unlawful possession of a firearm. The presiding juror signed the verdict forms accordingly. The district court later sentenced Daniels to 300 months in prison for the shooting of Jones, reflecting a significant downward durational departure, and imposed considerably shorter sentences for the shooting of Henderson and the firearms conviction, with all three to be served concurrently. Daniels duly appealed.

In the direct appeal, a lawyer with the Appellate Defender Office filed a brief on Daniels' behalf attacking the district court's refusal to instruct the jury on attempted voluntary manslaughter, asserting prosecutorial misconduct, disputing the determination of Daniels' criminal history, and challenging the restitution order. Daniels filed his own supplemental brief raising additional issues. Neither Daniels nor his appellate lawyer asserted any error associated with the verdict forms. This court denied Daniels relief on all of the points raised in his direct appeal, and the Kansas Supreme Court denied his petition for review. *State v. Daniels*, No. 108,678, 2014 WL 2619373 (Kan. App. 2014) (unpublished opinion), *rev. denied* 301 Kan. 1048 (2015).

6

Without a lawyer, Daniels then prepared and filed his motion for habeas corpus relief under K.S.A. 60-1507. He asserted both that his trial lawyer and the lawyer handling the direct appeal provided constitutionally deficient representation for failing to challenge the verdict forms and that the forms impermissibly constrained the jury's ability to return not guilty verdicts on the attempted murder charges. He did not dispute the legal sufficiency of his conviction for unlawful possession of a firearm. In a one-page order entered in February 2017, the district court denied the motion without appointing a lawyer for Daniels or holding a hearing. The district court reasoned that any argument about defects in the verdict forms could have been asserted in the direct appeal and Daniels' claim of ineffective legal representation had "no basis in fact or the record."

LEGAL ANALYSIS

With the assistance of a new lawyer, Daniels has appealed the summary denial of his 60-1507 motion. That is what we now have in front of us. Daniels repeats his contention that the trial and appellate lawyers handling his direct criminal case were constitutionally ineffective for failing to challenge the verdict forms and that he should receive a new trial as a result. He asks alternatively that we remand to the district court for an evidentiary hearing on his motion. We begin by outlining the legal principles governing review of motions for habeas corpus relief. We then apply those principles to Daniels' claim.

*1. Core Habeas Corpus Principles*

To prevail on a 60-1507 motion, a convicted defendant must show both that his or her legal representation fell below the objective standard of reasonable competence guaranteed by the right to counsel in the Sixth Amendment to the United States Constitution and that absent the substandard lawyering there probably would have been a different outcome in the criminal case. *Strickland v. Washington*, 466 U.S. 668, 687-88,

7

694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014); see *Chamberlain v. State*, 236 Kan. 650, Syl. ¶¶ 3, 4, 694 P.2d 468 (1985) (adopting and stating *Strickland* test for ineffective assistance). A reasonable probability of a different outcome "undermine[s] confidence" in the result and marks the criminal proceeding as fundamentally unfair. See *Strickland*, 466 U.S. at 694; *State v. Cheatham*, 296 Kan. 417, Syl. ¶ 6, 292 P.3d 318 (2013). Daniels, then, must prove constitutionally inadequate representation *and* sufficient prejudice attributable to that representation materially calling into question the resulting convictions. As we have said, he challenges the constitutional adequacy of his trial lawyer and the lawyer who handled the direct appeal. The *Strickland* test also guides review of an appellate lawyer's representation of a defendant in a criminal case. See *Miller v. State*, 298 Kan. 921, 929-30, 318 P.3d 155 (2014) (applying *Strickland* test to performance of lawyer handling direct appeal).

In general, the courts look at a lawyer's overall performance in representing a criminal defendant to determine whether the Sixth Amendment right to counsel has been satisfied, meaning that a minor mistake or even a number of minor mistakes do not typically amount to a constitutional violation. See *Harrington v. Richter*, 562 U.S. 86, 110, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011); *Kimmelman v. Morrison*, 477 U.S. 365, 386, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986); *Bland v. Hardy*, 672 F.3d 445, 450 (7th Cir. 2012) ("[T]he question under *Strickland* is not whether the lawyer made a mistake, even a serious one; it is whether the lawyer's *overall* performance was professionally competent."). But a single error causing sufficiently substantial legal harm to the defendant to undermine an unfavorable outcome at trial or on appeal will suffice. See *Miller*, 298 Kan. at 938-39.

As the United States Supreme Court and the Kansas Supreme Court have stressed, review of the representation should be deferential and hindsight criticism tempered lest the evaluation of a lawyer's performance be unduly colored by lack of success

8

notwithstanding demonstrable competence. See *Strickland*, 466 U.S. at 689-90; *Holmes v. State*, 292 Kan. 271, 275, 252 P.3d 573 (2011). Rarely should a lawyer's representation be considered substandard when he or she investigates the client's circumstances and then makes a deliberate strategic choice among arguably suitable options. *Strickland*, 466 U.S. at 690-91. Whether a lawyer had made reasoned strategic decisions bears on the competence component of the *Strickland* test.

As a practical matter, however, evidence bearing on strategic choices usually must be developed in a hearing on the 60-1507 motion at which lawyers produce their work files and testify about why they handled the criminal case in a particular manner, be it in the district court or in the appellate courts. In rare circumstances, an appellate court reviewing a 60-1507 motion could conclude that some specific action of the defense lawyer in the direct criminal case appeared so inept and proved so detrimental that it could not have been the product of a reasoned strategic decision. See *Cheatham*, 296 Kan. at 445 (The defense lawyer's "misguided plan was based on an obvious misunderstanding of the law, and it cannot be excused as justifiable trial strategy in this circumstance."); *State v. Hargrove*, 48 Kan. App. 2d 522, 551, 293 P.3d 787 (2013) ("No sound strategy could warrant a defendant assuming a heavier burden of proof than required under the law in establishing a defense[,]" so tendering such an instruction "could not possibly reflect [a] reasonable strategic choice.").

Regardless of the inadequacy of legal representation, a 60-1507 motion fails if the movant cannot establish substantial prejudice. And the district court properly may deny a motion that falters on the prejudice component of the *Strickland* test without assessing the sufficiency of the representation. *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."); see *Edgar v. State*, 294 Kan. 828, 843-44, 283 P.3d 152 (2012); *Oliver v. State*, No. 106,532, 2013 WL 2395273, at *5 (Kan. App. 2013) (unpublished opinion). In other words, even assuming a criminal defendant's

9

legal representation fell below the Sixth Amendment standard, he or she is not entitled to habeas corpus relief if the result would have been no different with competent counsel.

A district court has three procedural options in considering a 60-1507 motion. The district court may summarily deny the motion, as happened here, if the claims in the motion and the record in the underlying criminal case conclusively show the movant is entitled to no relief. Or the district court may conduct a preliminary hearing with lawyers for the State and the movant to determine if a full evidentiary hearing is warranted. Finally, the district court may hold a full evidentiary hearing. See *Sola-Morales*, 300 Kan. at 881. Absent an evidentiary hearing, the district court must credit the factual allegations in the 60-1507 motion unless they are categorically rebutted in the record of the criminal case. When a district court denies the motion without appointing a lawyer and without holding any hearing, we exercise unlimited review on appeal. *Bellamy v. State*, 285 Kan. 346, 354, 172 P.3d 10 (2007). Since the district court received no new evidence, we can review the motion and the underlying record equally well.

### 2. Core Principles Applied

Because the district court summarily denied the 60-1507 motion, the lawyers representing Daniels in the underlying criminal case have not described what, if any, strategic considerations prompted them to refrain from objecting to the verdict forms. As we have outlined, we could affirm the district court anyway if the verdict forms were free of error or any errors were harmless. But we have concluded the verdicts forms created prejudicial error. After explaining our conclusion, we discuss why we must, nonetheless, remand to the district court for an evidentiary hearing. We first address the district court's rationale in denying Daniels' 60-1507 motion.

10

*2a. District Court's Faulty Rationale for Denying Motion*

The district court offered a legally miscast rationale to summarily deny Daniels' 60-1507 motion. The district court reasoned that Daniels could have challenged the sufficiency of the verdict forms in the direct appeal of his criminal case. That's true. And it's equally true that a habeas corpus motion cannot be used simply as a second appeal. *Manco v. State*, 51 Kan. App. 2d 733, 735, 354 P.3d 551 (2015); Supreme Court Rule 183(c)(3) (2019 Kan. S. Ct. R. 228). Rather, habeas corpus relief has been reserved for prejudicial errors entailing the violation of a criminal defendant's constitutional rights. See *State v. Reed*, 302 Kan. 227, 233-34, 352 P.3d 530 (2015); *Miller*, 298 Kan. at 922-23 (60-1507 motion properly raised constitutional claims of ineffective assistance of trial and appellate lawyers in direct criminal case). In his motion, Daniels asserted and facially supported a claim of ineffective assistance of counsel violating his Sixth Amendment rights precisely because his lawyers failed to challenge the verdict forms. The district court, therefore, could not have summarily denied the motion as a second appeal of a mere trial error.

*2b. Verdict Forms Compromised Daniels' Right to Jury Trial*

We begin our discussion with a pair of first principles that often go unmentioned simply because they form part of the indisputable bedrock of the criminal justice process. First, a defendant has a fundamental right to be found not guilty if the State fails to prove his or her guilt to a jury beyond a reasonable doubt. *Victor v. Nebraska*, 511 U.S. 1, 5, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994); *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) ("[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."); *Mashaney v. Board of Indigents' Defense Services*, 302 Kan. 625, 644-45, 355 P.3d 667 (2015). Second, a jury gives voice to its application of that right in a given case on the verdict

11

form the district court provides for that purpose. We add to those principles the reality that jurors are not presumed to be trained in the law and few typically have legal training. Moreover, district courts commonly advise jurors to rely exclusively on the law outlined in the instructions. See PIK Crim. 4th 68.010. So it was in Daniels' case.

Here, the verdict forms the district court provided the jurors confounded their ability to report a "true" verdict entailing a not guilty determination on either of the attempted murder charges. See K.S.A. 22-3412(b) ("jury shall be sworn to try the case"); K.S.A. 60-247(d) ("jurors must swear or affirm to . . . return a verdict according to the law and the evidence"); *State v. McClanahan*, 212 Kan. 208, 214, 510 P.2d 153 (1973) (noting "oath administered to every juror" to return verdict based on relevant law and evidence). The district court did not give the jurors a separate verdict form for each count of attempted first-degree murder and effectively blended the two together along with the lesser included offenses. In turn, the jurors were not provided a distinct place to indicate a not guilty verdict on each of those charges. The district court simply handed the jurors a single page containing a generic or general not guilty verdict that refers to none of the specific charges.

All of that had to be, at the very least, confusing. The instructions told the jurors to consider the charged crimes separately and to render a verdict on each of them. But there were three crimes—two attempted murders and one unlawful possession of a firearm— and only two places to record not guilty verdicts—the generic single page and the line on the page specifically addressing the firearm offense.

We have no way of knowing how the jurors received or considered the general not guilty page of the verdict form. If they viewed it as the last page—as it has been preserved in the district court record—the jurors might have concluded that to find Daniels not guilty on the attempted murder charges they also had to find him not guilty on the firearms charge. And if they found him guilty on the firearms charge, they could

12

consider only convictions on the attempted first-degree murder charges or the lesser included offenses but not acquittal. In other words, a not guilty verdict on the firearms charge might have looked like a prerequisite to any consideration of not guilty verdicts on the attempted murder charges. As we pointed out, Daniels effectively confessed to the elements of the firearms charge in testifying during the trial to his version of the events. As trained professionals familiar with criminal law, we understand that sort of linkage would be improper, and the very suggestion of it seems strange to us. But we can't superimpose our training and understanding on how the jurors may well have tried to assimilate what they had been given.

The picture remains muddled if we assume the jurors treated the generic not guilty verdict as the second of the three pages, coming between the mashup setting out places for guilty verdicts on the four attempted murder options (attempted first-degree murder or attempted second-degree murder for both Jones and Henderson) and the self-contained verdict form for the firearms charge. In that configuration, the jurors reasonably could have concluded they had to find Daniels not guilty of both attempted murder charges but could not return a split verdict convicting on one and not the other.

The question the jurors posed to the district court during their deliberations strongly suggests the sort of confusion we have described. The district court and the lawyers fumbled the answer by referring the jurors to an inapposite instruction. They intended to direct the jurors to the instruction on separate consideration of and verdicts for each of the three charged crimes. But even the intended reference would not necessarily have been especially illuminating, since the available not guilty options didn't correspond to the individual charges.

The failure to include a clearly delineated not guilty option on a verdict form strikes at the very core of a criminal jury trial: A group of 12 citizens are to impartially determine whether another person is guilty or not guilty of a criminal charge the

13

government has lodged against that person. The process is manifestly degraded if the group has no obvious way to voice a determination of not guilty. The degradation compromises the defendant's right to jury trial guaranteed in the Sixth Amendment and the due process protections of the Fourteenth Amendment to the United States Constitution. See *Duncan v. Louisiana*, 391 U.S. 145, 149, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968) ("[W]e believe that trial by jury in criminal cases is fundamental to the American scheme of justice[.]"); *State v. Beaman*, 295 Kan. 853, 858, 286 P.3d 876 (2012) (characterizing criminal defendant's right to jury trial as "fundamental"). We comfortably conclude that the district court erred in the way it prepared the verdict forms.

In a direct criminal case, appellate courts review verdict forms for error in the same manner they look at jury instructions. That makes sense, since they serve integrated functions—the instructions inform jurors of the law they are to apply, and the verdict forms provide the device for them to record their ultimate determinations after applying that law to the facts they find. So absent an objection in the district court during the trial, we would review a challenge to a verdict form for clear error. *State v. Burnett*, 293 Kan. 840, 847, 270 P.3d 1115 (2012) (absent trial objection, verdict form reviewed on appeal for clear error). In other words, the absence of a trial objection to a deficient verdict form would not preclude appellate review. We have little doubt that a verdict form with fewer not guilty options than principal charges against a defendant defines clear error by example, except, perhaps, in some unusual circumstances not present in this case.

   *2c. Assessing the Impact of the Error*

Here, the error went beyond a minor defect to compromise the elemental purpose of the verdict forms in a way comparable to the omission of any not guilty option at all. And at least arguably, the verdict forms actually did so with respect to one of the attempted murder charges. Despite the gravity of the problem, it cannot be characterized as a structural error automatically requiring reversal of a conviction. Among

14

constitutional defects, structural errors stand apart because, by definition, they undermine the integrity of the adjudicatory process and, therefore, cannot be excused even if a defendant may be unable to demonstrate actual prejudice. See *Neder v. United States*, 527 U.S. 1, 8-9, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (Structural errors "'infect the entire trial process'" and "deprive defendants of 'basic protections'" essential to the reliable functioning of the criminal justice process; as such, they "defy harmless-error review.") (quoting *Rose v. Clark*, 478 U.S. 570, 577-78, 106 S. Ct. 3101, 92 L. Ed. 2d 460 [1986]). There are cases in which garbling of the not guilty option on a verdict form or its outright omission could be harmless. For example, that would be true anytime a defendant principally argues he or she is guilty of a crime materially less serious than what the government has charged. See, e.g., *State v. Orange*, No. 108,806, 2014 WL 37688, at *5 (Kan. App. 2014) (unpublished opinion) (at trial, defendant effectively conceded guilt of involuntary manslaughter to avoid conviction on second-degree murder charge); *State v. Thomas*, No. 100,239, 2009 WL 3270858, at *2 (Kan. App. 2009) (unpublished opinion); see also *Hernandez v. State*, No. 99,921, 2009 WL 1858244, at *3 (Kan. App. 2009) (unpublished opinion) (trial lawyer provided constitutionally adequate representation in pursuing guilt-based defense with client's consent). In *Thomas*, this court found the omission of a not guilty option on the verdict form for one count of selling methamphetamine within 1,000 feet of a school to be harmless error because the defendant testified at trial and admitted to selling the drugs but denied doing so near a school—thereby confessing to a lesser included offense and effectively precluding a not guilty verdict based on the evidence. 2009 WL 3270858, at *3.

So a botched verdict form of the kind we are looking at here is subject to review for harmless error. What remains is the appropriate test for harmlessness when the error compromises the defendant's fundamental right to a not guilty verdict and impinges on the jury's ability to render that verdict. It isn't good enough to say there may have been a great deal of evidence against a given defendant, allowing us to assume the jurors would have rejected a not guilty verdict even if they had an obvious path to that result on the

15

verdict form. Given the issues, that formulation of harmlessness teeters on the precipice of directing a verdict in a criminal case—something courts cannot constitutionally presume to do in derogation of a defendant's right to jury trial. See *Sullivan v. Louisiana*, 508 U.S. 275, 277, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993) (district court "may not direct a verdict for the State, no matter how overwhelming the evidence"); *United States v. Ramirez-Castillo*, 748 F.3d 205, 212-13 (4th Cir. 2014).

A persuasive, though not identical, analogy arises from those cases in which a jury instruction inadvertently omits an element of the charged crime, so the jurors never consider the element in reaching a guilty verdict. See *Neder*, 527 U.S. at 7; *State v. Richardson*, 290 Kan. 176, 181-82, 224 P.3d 553 (2010). In *Neder*, the Court characterized the omission or material misdescription of an element of the charged crime as an error preventing the jurors from rendering a "'complete verdict,'" compromising the defendant's Sixth Amendment right to a jury trial. 527 U.S. at 12. The verdict forms here also inhibited the jurors' ability to fashion a complete verdict on each of the crimes, particularly the attempted murder charges.

The *Neder* Court applied the harmlessness test for constitutional error to the omitted element issue by asking whether the defendant had both contested the element and presented substantive evidence actually controverting it. If so, the error could not be dismissed as harmless, and to do otherwise would place the appellate court in the posture of acting akin to a second jury impermissibly weighing the evidence. 527 U.S. at 19. In *Richardson*, the Kansas Supreme Court embraced the *Neder* standard and held the error could be harmless only when "the omitted element was uncontested and supported by such overwhelming evidence that the jury verdict would have been the same without the omission." 290 Kan. at 182. The standard strikes a balance designed to insulate a fundamental constitutional right afforded criminal defendants against what would be, in some instances, a gratuitous remedy if the error were treated as structural.

16

The *Neder* standard and its balancing of an essential right and an appropriately calibrated remedy fairly suits the error we confront here. Daniels obviously contested the attempted first-degree murder charges and presented material evidence disputing them. We cannot say the barriers to the jurors rendering a complete verdict on them should be dismissed as harmless under the circumstances. By way of contrast, any error as to the jury's guilty verdict on the firearms charge would have to be considered harmless. First and foremost, Daniels never disputed the evidence of his guilt on the firearms charge at trial and essentially provided a confession to it from the witness stand. Moreover, that portion of the verdict forms covering the firearms charge was self-contained and provided unambiguous options for the jury to return either a guilty verdict or a not guilty verdict. Those considerations likely explain why Daniels has not challenged the conviction on the firearms charge.

We find that Daniels has shown the lawyers representing him at trial and on direct appeal materially prejudiced him when they failed to challenge how the verdict forms addressed the attempted first-degree and attempted second-degree murder charges. The failure satisfies the second part of the *Strickland* test for habeas corpus relief.

*Remedy*

As we have said, the district court denied Daniels' motion without appointing a lawyer for him and without holding a hearing. In doing so, the district court considered only the motion itself and the record in the direct criminal case. The State had no opportunity to address the motion. The district court could not have summarily granted relief to Daniels based solely on his motion and the record; it would have had to afford the State a chance to be heard.

Although the State has filed a brief here, that is not a fungible substitute for an evidentiary hearing in the district court. We, therefore, doubt we could grant Daniels'

motion to the extent he seeks a new trial. Rather, his alternative request for remand to the district court for an evidentiary hearing more properly conforms to the adjudicatory roadmap set out in K.S.A. 60-1507.

At the evidentiary hearing, the State and Daniels, through his new lawyer, will have the opportunity to explore the strategic reasons, if any, the lawyers handling the trial and the direct criminal appeal may have had for declining to challenge the adequacy of the verdict forms. Under *Strickland*, a 60-1507 motion may be denied if the challenged action or inaction entailed a reasoned strategic choice even though that choice ultimately may not have been a particularly good option. See *Strickland*, 466 U.S. at 690-91. By the same token, overlooking a potential issue isn't strategic. See *Miller*, 298 Kan. at 932. And a lawyer's chosen course of conduct may be so lacking in benefit to the client as to be without any reasoned strategic sense or value. See *Cheatham*, 296 Kan. at 445. Neither we nor the district court can make that determination from the existing record.

We, therefore, reverse the district court's denial of Daniels' 60-1507 motion as to his convictions for the attempted first-degree murder of Jones and the attempted second-degree murder of Henderson and remand with directions to appoint a lawyer for Daniels and to promptly hold an evidentiary hearing on his motion.

IN THE TWENTY-NINTH JUDICIAL DISTRICT
DISTRICT COURT, WYANDOTTE COUNTY, KANSAS

| | | |
|---|---|---|
| STATE OF KANSAS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No. 11 CR 1137 |
| | ) | |
| JEALONI DANIELS, | ) | |
| | ) | |
| Defendant | ) | |

## **V E R D I C T**

We, the jury, find the defendant, Jealoni Daniels, guilty of the crime of attempted first degree murder concerning John Jones.

_____
Presiding Juror

We, the jury, find the defendant, Jealoni Daniels, guilty of the crime of attempted first degree murder concerning Dennis Henderson.

_____
Presiding Juror

We, the jury, find the defendant, Jealoni Daniels, guilty of the crime of attempted second degree murder concerning John Jones.

_____
Presiding Juror

We, the jury, find the defendant, Jealoni Daniels, guilty of the crime of attempted second degree murder concerning Dennis Henderson.

_____
Presiding Juror

-------------------------------------------------------------------------------------------------------

IN THE TWENTY-NINTH JUDICIAL DISTRICT
DISTRICT COURT, WYANDOTTE COUNTY, KANSAS

| | | |
|---|---|---|
| STATE OF KANSAS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No. 11 CR 1137 |
| | ) | |
| JEALONI DANIELS, | ) | |
| | ) | |
| Defendant | ) | |

## **V E R D I C T**

We, the jury, find the defendant, Jealoni Daniels, guilty of the crime of criminal possession of a firearm.

_____
Presiding Juror

We, the jury, find the defendant, Jealoni Daniels, not guilty of the crime of criminal possession of a firearm.

_____
Presiding Juror

We, the jury, find the defendant, Jealoni Daniels, not guilty.

_____
Presiding Juror

----------------------------------------